Please call the next case. 112-1961 Thomas Sitz v. Snippet Stone, Container Court. Good morning, your honors, esteemed counsel. May it please the court, my name is Chuck Candiano. I'm here on behalf of Mr. Thomas Sitarz. Your honors, from what I've heard today, I think it would please you to have counsel distill their argument as much as possible. And here, it seems we have a credibility issue. All we have is a credibility issue. And I may even reverse myself. I said it was a manifest way case. This may be a legal question. Because here, the commission, we had a trial before an arbitrator. The arbitrator renders a fully favorable decision and includes in that decision specific findings of credibility or incredibility with regard to each of several witnesses. All of which becomes irrelevant once the commission gets the case, correct? Completely irrelevant. That's my point. And, you know, when this court and other courts have heard decisions where the arbitrator has, I'm sorry, where the commission has completely disregarded the credibility findings of the arbitrator, the court reasonably requests some support for that, you know, flipping the credibility decision on its head. Well, didn't they find a number of specific inconsistencies and problems with the claimant's testimony? No, Your Honor. I don't believe there was a single inconsistency. There was no inconsistencies? No. The only support, as a matter of fact, the only support cited in support of the commission's decision to overturn the arbitrator's decision was this hearsay note that was prepared in anticipation of litigation two weeks after the accident. Let's start on the level playing field, okay? Yes, sir. This case turns on credibility, does it not? It does. None of the claimant's treating physicians, as I understand it, tell me if I missed it, offered any opinion that his injuries were sustained at work, correct? There's no clausal connection opinion by any doctors, correct? Correct. Yes or no? Correct. Okay. So it does stand on his credibility completely? It stands on his credibility, but all the facts support what he said. Okay. He testified, did he not, that prior to May 2006 he experienced no pain in his groin. However, medical records clearly show that the claimant saw Dr. Shaw and Dr. Aaron in February 2002 due to groin pain. That's not a credibility problem. Four years earlier, he had apparently a groin pain. But he told, he testified he didn't have any groin pain before, right? He didn't recall, that's true. He testified he was not employed prior to 1999 when he was hired by the employer. However, he filed a compensation claim claiming he sustained problems at work at Elgin Industry. I mean, you can't have it both ways. He said he was not previously employed, and obviously he was. That's not a credibility issue? I don't see how, Your Honor, with all due respect, I don't see how it has any bearing on the facts that this young man was testifying to at the time. If he's not telling the truth on the witness stand on any issue, I suggest it has a lot to do with his credibility, even if it doesn't relate to the work accident. Tell us why it doesn't matter. Well, of course, inconsistencies always matter, Your Honor. But this is a gentleman who had significant learning disabilities and who was, at the time of the, on the first day of his testimony, apparently not medicated. Did you point that out to the commission? Of course I did. I did, Your Honor. It did influence her decision, right? That was pointed out to the arbitrator on the record, but it was not considered by the commission. But, Your Honor, even if someone, okay, these are not, you're absolutely correct, we do this every day. When people, we make judgment calls, we make determinations as to credibility, and when we find inconsistencies, when people tell us things that we later learn are not so or we know through independent sources are not the case, of course, we tend to call their credibility into question. And that's what happened there. But not here. Here, Your Honor, here it's not possible. Because here, this young man reported for work a little before 4 o'clock in the morning, did all of his work, worked for four hours. His work is clearly heavy work. He reported to his supervisor around 8 o'clock in the morning, about four hours later, Dick Ford, that he hurt himself. Not the smartest bulb in the box, obviously. He drove himself to the hospital nearest to his home, which was 50 minutes away. He checks into the hospital an hour and five minutes after he reports the accident to Dick Ford. And he's assessed at the emergency room with a massive bilateral inguinal hernia. So I ask you, Your Honor, no matter whether the guy has a bad memory, whether he can't remember that four or five years earlier he did go to the doctor on one occasion for groin pain, or whether he can't remember seven years earlier that he had a job. You're saying those are peripheral. We ought to concentrate on what occurred the day of the accident. Well, we have such concrete evidence. Okay. So let's just take that day of the accident. Don't the emergency room records from the day of the accident when he sought treatment that day indicate that he complained of having groin pain for the past 24 hours and discomfort in the groin for two weeks? Yes, they do. Okay. How does that support your client's case? Because these types of injuries are ‑‑ he did this heavy work every day of his life. Whether he strained himself two weeks earlier and then fought through it and then whatever he did on that particular morning made it so bad that he couldn't stand it and had to go to the hospital, it doesn't make any difference. I mean, we've been instructed since the 60s with Republic Steel that we only need one causative factor. So the fact that he may have had a preexisting predisposition or that this injury may have begun days or weeks prior to May 4th of 2006 doesn't really have any bearing on whether or not the injury became much worse on that day. The treating surgeon, Dr. Clay, did render an opinion that she didn't believe it would be possible for someone with that serious an injury to perform the heavy work that he clearly performed. And also, Your Honor, I would say when you're talking about credibility here, look, the only piece of evidence is this hearsay document created in anticipation of litigation two weeks after the accident by someone who doesn't have any independent recollection of talking with the petitioner. Now, what about Dick Ford? You say it hinges on that. Well, Dick Ford is the guy he reported the accident to. Now, unfortunately, Dick Ford apparently died of a heart attack 18 months later. But two weeks after the accident, the human resource director knew that something, you know, this may be the source of litigation. So she directed the guy, Waylon, to prepare that statement. Did the commission say this case hinged on that letter? They as much as say that, Your Honor. They used that letter for all the contradictions. They don't even note the contradictions that I don't recall if you or Justice Hudson brought up about the prior, whether he was working prior to 1999 or — Right. He said he was not. Right. But I don't even recall the commission mentioning that. But, you know, again, you know, whether — this is a guy with serious learning disabilities. And so if his memory isn't really, really sharp, again, I just don't see that it matters. Because, again, if he presented to the hospital, he didn't have time to stop anywhere between leaving his job site and presenting himself at the emergency room at Kishwaukee Hospital. And when he presented himself at the emergency room, he was diagnosed with massive bilateral inguinal hernias. And so — I don't think anybody disputes that. Right. I think the problem is cutting to the chase here. What can you do with that injury? The arbitrator concluded that on May 4th, 2006, a specific date — Yes. That's what you found, claimant sustained the accident in question. Correct. Okay. There is a long history of seeking treatment for Goring problems way before May 4th, 2006, isn't there? And how does that preclude having a specific injury on May 4th of 2006? It doesn't. But if you file your claim saying that what took place on May 4th, 2006 caused his injury, and that's what he's claiming, that he had no preexisting problems, the commission probably felt that the injury didn't happen on May 4th, 2006, as he claimed. But, Your Honor, I direct you to the opinion of the treating surgeon. There was no — first of all, the only IME in this matter was a doctor who explained what was going on as far as the nerve entrapment. But the treating surgeon was the only opinion that was sought with regard to what he could do and what he couldn't do. And she clearly stated that she didn't see how he would be able to do the work that he clearly did for four hours with two massive bilateral inguinal hernias. I'm sorry. Did the treating surgeon give an opinion or testify as to medically what his condition was in the time immediately preceding the date of the accident, May 4th, when apparently he acknowledges he's having groin pain? What is it that's occurring in his body at that time, immediately preceding the accident? Then what happens on May 4th? And then what is his condition immediately after May 4th? What does the evidence in the record suggest is that progression of a condition? What's the surgeon say about that? Or does the surgeon explain? The surgeon, notwithstanding multiple assurances by myself and her own attorney, the surgeon here is an Eastern European woman who was scared to death that someone was going to sue her for malpractice. And that's in the record? I don't believe it's in the record, Your Honor. But you're asking about the dynamic that was going on here. It was like pulling teeth to get any sort of opinion out of her at all. But she's not with it. It doesn't matter. No, no. Correct. But she did render the opinion that she didn't believe that he could do the work, that anyone could do the work. And he was supervised, and he did do the work. So I submit to you that the fact that he did the work, that he was able to do the work, and that he immediately presents to the hospital with this significant injury, that the only doctor who testified to that effect says, you wouldn't be able to do that work. I think that's enough. And that convinced the arbitrator. Now, to – there is no – the innuendo that the commission relied upon is also in this – all this about, well, maybe he was lifting weights. There's so much about lifting weights. There's no evidence, no evidence whatever, adduced by the commission as to whether weightlifting could possibly have caused injury. They allude to that over and over and over. And, you know, as we know, Voykin expressly prohibits that. You can't say, oh, maybe it was this, because that's really their big argument. He looked more defined. Now, he said, well, I was running and I was trying to diet. Now, if you're lifting weights every day and you lose 50 pounds, you're going to appear more muscular. It doesn't mean that you've been weightlifting. But even if you were weightlifting, you know, the commission doesn't have any medical expert to rely upon pursuant to Voykin. There's no medical expert that testified, oh, yeah, you know, doing crunches or doing squats or whatever he was doing or is alleged to have been doing, because he said he didn't do anything. Whatever he's alleged to be doing, oh, yeah, that could cause this injury or that couldn't cause this injury. We don't have any medical testimony whatever either way. So given the facts that we do have and given the inferences that I believe we must take, this young man clearly something happened. And, again, you're right, we don't have a doctor, but we all know that you take a piece of fabric, you take a piece of muscle, you stretch it, you stretch it, pretty soon it tears. I can't tell you that happened. I'm not a medical doctor. But, you know, we don't have to leave our common sense at the door here either. I mean... Your time is up. Yes, thank you. You'll have time and reply. Thank you. Thank you. May I proceed? Good morning, Your Honors. May it please the Court, Counsel. My name is Mark Subchak. I'm here on behalf of the Defendant Respondent Smurf at Stone Container Corporation. As Counsel has seated here, this is a manifest weight case. He brought up a number of points that are important. One of the things that I would like to point out is that there are a number of points that are really outside of what the central issue here is, which is credibility determination. As Justice Hudson pointed out, there is a laundry list of conflicting, incredible testimony from the Petitioner during his examination. Not only did he testify about not previously working at Elgin Industries, but he testified that he was not working during the period between February of 07 and October, November of 2008. He was working at Genoa School District then. Not only did he testify that he had absolutely no subsequent work injuries after he left Altivity, which was the company that took over for Smurf at Stone on June 30, 2006, the Petitioner testified, nope, no subsequent work injuries after that. Sure enough, he's presented with records of an injury report at Genoa High School that he had a slip-and-fall accident for which he sought treatment. And he did not testify about that. Let me ask you, in fairness to him, sort of a point of question. Yes, I raised the credibility issues, to which I think he's sort of saying, yeah, it happened, quite frankly, but these are sort of collateral issues here. It doesn't detract from what he believes to be the medical evidence that supports his claim. So what sayeth you to that? There is no medical evidence that supports his claim. The medical evidence, the surgeon, Dr. Claude. Just a minute. He reported to the hospital and no doubt had this injury. Correct. How do you account for the fact that he'd worked doing this heavy lifting for four hours during that shift before he did that? There is no testimony from any medical expert that he couldn't do that. Now, I know you talked about Dr. Claude. But she didn't offer an opinion. She was very narrow about her opinions were based on when she saw him. And she saw him in May, on May 15th of 2006. He actually did not work for, I'm sorry, when he went to the ER, he specifically told the emergency room that he had had constant pain for 24 hours. I can't say exactly why he worked, but he told them he had pain for 24 hours. He said he had intermittent pain for more than two weeks. When he goes to Dr. Claude for a surgical consult on May 15th, he tells her he has a two to three week injury history. You know, this is a physical labor job. I'm sure this is not the first time that Mr. Sitars would have gone to work with aches and pains. Now, it is an admittedly severe injury. I don't think that anybody is disputing that. But in terms of actual medical testimony saying that this accident was caused at work on May 4th, he has not. And in fact, the Petitioner denied having any prior complaints before May 4th. So if you note in Petitioner's argument here, the problem with the case is that they can't reconcile this. They're claiming a specific date of injury, but then they're saying maybe it was repetitive and he had these pains before, but the Petitioner specifically denied. And I can ask a question. This was consolidated with another case, was it not, the claim of injury? Yes, it was, Your Honor. On January the 29th, 2007? Correct, Your Honor. Did the arbitrator make a credibility finding when he denied him benefits in that case? Yes, he did. What did he say? He said that the Petitioner was not credible. And they were tried together? They were tried simultaneously. Same record, same evidence, same witnesses, same counsel for Altivity, which is the subsequent company that took over from Smurf at Stone. It was there. All right. So to call out the essence of your argument, you're saying this case turns on credibility. The Commission did not find any credible witnesses within their province. There is no credible medical evidence to support the Petitioner's claim aside from his statements. Correct. And since they don't have to believe him, the case falls on credibility. Manifest weight of the evidence. Credible. Unless Your Honors have any additional questions? I don't believe we do. Thank you. Thank you. You may reply. Again, you know, we're commanded by the case law to, you know, look at the entire record when we look at credibility decisions generally. And I think it's very important in doing that to have a sense of the dynamics, of what was going on in people's heads. And because Your Honors do hear so many matters, I just appreciate the opportunity to remind you what was going on in this young man's head. And much of this, if not all of it, was adduced at trial. This is a young man, again, clearly below average intelligence, with learning disabilities, who had a young child at the time of this accident, had a child who was barely a year old, who had severe congenital deficits that required massive medical attention. The employer's group health insurance had already paid a million dollars on the case by the time he had this injury. And there's testimony from the, during the trial, that this gentleman had sustained, I want to say, three prior smaller work injuries at Smurfett Stone. They were relatively insignificant, but they were work injuries. And he testified that he had a conversation with Linda Rue, the Director of Human Resources, that, you know, how she should handle this. And she told him that if it was handled as a work injury, he'd probably be fired. And lo and behold, the next time he reported a work injury in January of 2007, he was fired within a week. So that's going through his mind. And he's thinking to himself, oh, damn, if I lose my job, I'll lose my health insurance. If I lose my health insurance, who's going to pay for my baby's medical bills? So he went out of his way not to point the finger, if you will. He wasn't looking for benefits. He wanted to get back to work. He wanted to get fixed at the time of the accident. He used his vacation time. The medical bills were paid through the group health insurance. He just wanted to get back to work. This, he would never have even met, he never would have filed a worker's compensation claim in this matter until the summer of 2006 when he could no longer work because he had this terrible abdominal pain, which was eventually determined to be nerve entrapment as a result of the surgery. Just as a, he, it was a very severe surgery, he's very young, so he was likely to have it. So, but he didn't know that, and he eventually thought that he was re-injured, and that's why the other claim was filed. Now, it's no secret, I mean, that's all that you do, and that's all that all of us do is worker's compensation.  The proposed decisions are written by the attorneys who represent the parties, and the arbitrators are so overworked, many times they skip to the end, and if the result is what they believe is appropriate, they'll sign it. In this case, the, and I only mention this because it was brought up about the contrary credibility finding in the companion case. Petitioner, the appellant admitted that, because we found medically, that he was not injured in January of 2007. Why that gilding the lily took place of the other attorney putting that in there, that, you know, he was found to be not credible, I have no idea. Petitioner never sought any compensation from the 2007 accident, because it was found not to have been an accident. He was not re-injured in January of 2007. It was simply that this nerve entrapment had become so significant that he had severe pain on exertion. That was completely eliminated. But that's the companion case. In any event, this is what was going through his mind. So if you're wondering to yourselves, well, why isn't this better memorialized as a worker's compensation claim, you have a guy who's not too bright. You have a guy who's scared to death of losing his job, and it's not just any guy who's scared of losing his job. You have a guy who's supporting, you know, a child with severe medical problems, and the only means of securing medical care for her is keeping his job. So does it surprise anyone here that a father is going to go through whatever he needs to go through as far as pain or whatever, or to be able to care for his child? Or, you know, to be able to care for his daughter. That's the dynamic that's unreported. And these other small inconsistencies, Your Honor, again, I believe those are easily attributed to or dismissed by the fact that this gentleman, you know, is of such marginal intelligence. I thank you all. Do you have any questions, Your Honors? I don't believe there are. Thank you so much. Thank you. Thank you, counsel, both for your arguments in this matter. This matter will be taken under advisement and a written disposition shall issue. The court will stand in recess subject to call.